THE STATE OF FLORIDA, EX REL. E. J. TRIAY, AS RECEIVER OF THE JACKSONVILLE TRACTION COMPANY, *Relator,* v. R. HUDSON BURR, NEWTON A. BLITCH AND ROYAL C. DUNN, AS THE RAILROAD COMMISSIONERS OF THE STATE OF FLORIDA, *Respondents.*

Opinion Filed March 19, 1920.

1. When a tribunal refuses to exercise jurisdiction that it clearly possesses and ought to exercise, mandamus is the proper remedy to compel its exercise.

2. The Railroad Commissioners are administrative officers having statutory powers and duties; and when they decline to exercise authority or to perform duties conferred upon them by law, they may by mandamus, in the absence of other adequate remedy afforded by law, be required in proper cases duly presented to proceed with the performance of their duties. In such cases the command is to proceed to exercise their authority and discretion.

3. Municipalities may exercise only such powers as are clearly conferred upon them by the express or implied provisions of law; and all doubts as to the existence of a power in a municipality is resolved against the city. This rule was applicable to statutes conferring authority upon the Railroad Commissioners until the enactment of Chapter 6527, Acts of 1913, which provides that "the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally" and that "all doubts as to their jurisdiction and powers shall be resolved in their favor."

4. Independently of a right to regulate and control the rates to be charged for public service reserved in a grant of a franchise or right to use the city streets, a city or other municipality has no power to regulate the rates to be charged by public service corporations in the absence of express or plain legislative authority to do so. Nor does such authority arise from the power to regulate the opening and use of streets, nor from a grant of the general right to control and regulate the right to erect works in the streets of the city.

5. Where it is doubtful whether a statute authorizes a municipality to fix rates for a public utility company, such doubt must be resolved against the authority of the city.

6. Even if authority is by statute given to a municipality to fix rates for a public service corporation operating therein, such authority is subject to legislative control.

7. If there is a general law conferring upon municipalties authority to fix rates for street railroads and also a special law conferring a similar power upon a particular city, being inconsistent with the general law, the special or local law prevails as to the city to which it applies.

8. The provisions of Chapter 4052, Laws of Florida, Sections 1024-8, General Statutes, do not confer upon municipalities authority to fix rates for public utility corporations. Nor does Chapter 4859, Acts of 1899, Section 1016, General Statutes, confer such authority on municipalities.

9.  The charter Act, Chapter 3775, Acts 1887, conferring upon the
    city of Jacksonville the "power by ordinance   *   to grant the
    right of way through the streets, avenues and squares of said
    city for the purpose of street or other railroads" and Chap-
    ter 5347, Acts of 1903, amending the city charter, do not
    confer upon the city authority to fix rates of fares for street
    railroads.

10. Any contract ordinance passed by the city with statutory
    authority fixing by agreement street car fares, as an incident
    to the granting of franchises to a street railroad company,
    is subject to legislative control.

11. All regulations and contracts relative to transportation rates
    for common carriers, whether made by legislative authority
    or otherwise, are subject to a proper exercise of the police
    power of the State, under which power such rates may
    from time to time be increased or reduced or otherwise
    regulated as the interests of the public and the organic
    property rights of the carriers may require.  The inherent
    and reserved police power of the State cannot be abrogated
    by legislative enactment.

12. Section 30, Article XVI, of the State Constitution, expressly
    recognizes and does not limit the power of the Legislature
    to enact laws for the regulation and control of rates charged
    by common carriers; and the power may be exercised not-
    withstanding statutory or municipal regulations or private
    contracts that may have been made with reference to such
    rates.

13. Under Section 8, Article VIII, of the Constitution, the juris-
    diction and powers conferred by statute upon municipalities
    may be altered or amended at any time by the Legislature.

14. An ordinance of the city of Jacksonville which, by agreement
    with the Jacksonville Traction Company, limits to five cents
    the fares to be charged for street car transportation in the
    city, does not preclude the exercise by the State of its

right under the police power to fix rates for such transportation that will be reasonable and just to the carrier as well as to the public.

15. The constitution protects lawful and valid contract rights of private parties against illegal impairment by legislation; but the organic law, State or Federal, does not forbid legislative control of the rights of the public in the rates to be charged by common carriers even though such rates may be fixed by contract between the carrier and a municipality.

16. In the absence of express organic limitations, the police power of the State may be exercised in making just and reasonable rates to be charged by common carriers for the transportation of passengers and property; and all private contracts for such transportation in so far as they affect public rights, are in law made subject to a proper exercise of the police power of the State within organic limitations.

17. The State, in the exercise of its police power, may reduce or increase the rates fixed by a city ordinance for a common carrier company without reference to and independently of and notwithstanding the ordinance contract or rights thereunder claimed by the company or by the municipality or the public, when justice and the general welfare demand it.

18. In granting to corporations franchises to engage in the business of common carriers, the law contemplates a continuance of the public service, unless otherwise provided; and the law also contemplates an adequate and efficient service and that a reasonable compensation therefor shall be allowed, to comport with organic property rights; therefore it is clearly within the legislative power and duty to enact regulations by which a reasonable return for service rendered by common carriers may be effectuated as well as to enact regulations by which excessive charges and unjust discriminations by common carriers may be prevented and redressed.

19. The intent of a valid statute is the law, and this is ascertained by a consideration of the language of the enactment.

20. Where the legislative intent is clearly manifest by the language used, considered in its ordinary and grammatical sense, rules of construction are unnecessary and inapplicable.

21. Where there is ambiguity or uncertainty of meaning in the words employed in a statute, the legislative intent should be ascertained by a consideration of the entire act and of others *in pari materia;* and in doing so appropriate effect should, if possible, be given to all the material portions of the law so as to carry out and effectuate in the fullest degree the intention of the lawmakers.

22. Where a rule of construction is contained in the statute itself, that rule should be applied, if it is necessary to use any rules of construction, in determining the meaning or effect of the law.

23. The State has the power to reduce or increase or otherwise regulate the transportation fares charged by the Jacksonville Traction Company; and such power is not affected by any authority conferred upon the city of Jacksonville or by the ordinance of the city limiting the fares to five cents. And the power of the State in the premises may properly be exerted through the Railroad Commissioners, an administrative tribunal of the State, under appropriate authority conferred by statute.

24. When a valid statute confers a power or imposes a duty upon designated officials, a failure to exercise the power or to perform the duty does not affect the existence of the power or duty or curtail the right to require performance in a proper case.

25. The statute conferring upon the Railroad Commissioners authority to regulate the tariff rates of "all railroads, railroad companies and common carriers" must be interpreted by its own terms, and must be considered as a whole in determining whether it applies to street railroads.

26. Where an amendment is enacted, it must be assumed that a change in the existing law to the extent indicated by the nature of the amendment was intended unless a contrary intent appears from all of the enactments on the subject; and courts should give appropriate effect to the amend-ment.

27. Chapter 6527, Acts of 1913, "relating to the Railroad Commissioners and the regulation of common carriers," provides "that the laws relatives to the Railroad Commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest," and that "all doubts as to their jurisdiction and powers shall be resolved in their favor;" and these requirements should be observed in construing and applying the statute.

28. The words 'jurisdiction" relates to the subjects or objects over which authority may be exercised, as well as to the nature and extent of the authority to be exercised over the subjects or objects.

29. Chapter 6527, Acts of 1913, when "construed liberally" and when "all doubts as to the jurisdiction and powers of the Railroad Commissioners are resolved in their favor," as the statute expressly requires shall be done, and confers upon the Railroad Commissioners the authority and duty to "make reasonable and just rates of passenger tariffs to be observed by all railroads, railroad companies and common carriers doing business in this State over their respective lines," including electric street railroads engaged in transportation of passengers from point to point within the municipalities and outside thereof in this State; and this authority and duty are not affected by the ordinance which by agreement with the carrier limits the fares to five cents from points to points within the city.

30. The allegations of the alternative writ, admitted by the motion to quash, as to the confiscatory nature of the rates fixed by municipal ordinance, show a right in the relator to maintain this action.

State ex rel. Triay v. Burr et al.—Statement.

A case of original jurisdiction.

Motion to quash denied.

*P. O. Knight* and *J. L. Doggett,* for Relator;

*Bozier A. DeVane* and *P. H. Odom,* City Attorney of Jacksonville, for Respondents.

### STATEMENT.

An alternative writ of mandamus was issued by this court as follows:

"IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA, To R. Hudson Burr, Newton A. Blitch and Royal C. Dunn, as Railroad Commissioners of the State of Florida:

"Whereas, it has been suggested to us that the relator herein, E. J. Triay, is the Receiver of the Jacksonville Traction Company, a corporation organized and existing under the laws of the State of Massachusetts, which has an office and operates the system of street railways in the City of Jacksonville, County of Duval, State of Florida, and territory contiguous thereto; and that the Jacksonville Traction Company is a railroad company and common carrier of passengers, within the meaning of the Railroad Commission Act of the State of Florida; that the property of the Jacksonville Traction Company consists of a standard guage railroad track of about sixty-four and fourteen hundredths (64.14) miles, with the franchises and all of the necessary power stations, cars, equipment, and appurtenances for the opreation and maintenance thereof; and that the Jackson-

ville Traction Company also operates a line of railway about five miles in length owned by the Duval County Traction Company, which is likewise a Massachusetts corporation, which line is operated by the Jacksonville Traction Company as lessee, and all of the capital stock of the said Duval County Traction Company is likewise owned by the Jacksonville Traction Company; that said line of railway is, and has been for years, operated as a common carrier of passengers, not only in the City of Jacksonville, but in the territory contiguous thereto; that the total outstanding capital stock of the traction company consists of ten thousand shares of common stock of the par value of one hundred dollars a share, and five thousand shares of cumulative, six per cent. preferred stock, of the par value of one hundred dollars, making a total outstanding capital stock at par of one million, five hundred thousand dollars, of which one million dollars is comonn stock and five hundred thousand dollars is preferred stock; that the total outstanding bonded indebtedness of the traction company, secured by mortgages upon its franchise and properties above described, including bonds issued and assumed, amounts to two million, two hundred and ninety-eight thousand, five hundred dollars, consisting of one million, fifty-three thousand five hundred dollars of first consolidated mortgage, twenty-year gold bonds, due March 1, 1931, bearing interest at the rate of five per cent. per annum, payable March 1st and September 1st at the office of the State Street Trust Company of Boston, Massachusetts, trustee, and one million, two hundred and forty-five thousand dollars of first mortgage, twenty-five year, five per cent. gold bonds of Jacksonville Electric Company, the predecessor of the Jacksonville Traction Company, due May 1, 1927, interest payable May 1st and November 1st, at

the office of the American Trust Company of Boston, Massachusetts, trustee, said first mortgage bonds having been issued by the Jacksonville Electric Company and are a first mortgage on property now owned by the Jacksonville Traction Company, and assumed by it. Of said one million and fifty-three thousand dollars of consolidated mortgage bonds outstanding, one hundred and twelve thousand and five hundred dollars are pledged as collateral for ninety thousand dollars of notes of the Duval County Traction Company, hereinafter referred to, and fifty-six thousand, five hundred dollars are held in the treasury of the Jacksonville Traction Company; that the floating indebtedness of the Jacksonville Traction Company is approximately one million and ninety-five thousand dollars, consisting of seven hundred and fifty thousand dollars of two-year, six per cent. gold coupon notes, which became due March 1, 1919, and three hundred thousand dollars of notes payable chiefly to various banks, and including ninety thousand dollars of notes of the Duval County Traction Company endorsed by the Jacksonville Traction Company and by the firm of Stone & Webster, of which notes five thousand dollars is payable on demand, and the balance of two hundred and ninety-five thousand dollars is payable at various dates, beginning on November 26, 1919. In addition to which there is a very material current general indebtedness of the company; and, in addition there will be due on April 1, 1920, State and county taxes amounting to about thirty-nine thousand dollars.

"That the seven hundred and fifty thousand dollars of coupon notes became due and payable March 1, 1919, and that the Jacksonville Traction Company was without means to pay the same, and that default was made on said date in the payment of said notes and in the pay-

ment of the semi-annual interest thereon, due on said date, and that said coupon notes, together with interest thereon from September 1, 1918, are now over-due and unpaid; that of the three hundred thousand dollars of other notes payable to various banks, including the five thousand dollar note payable on demand, the time of maturity thereof began on November 26, 1919; that the Jacksonville Traction Company was without means to pay any of said notes, and is without means to pay any of them as and when they become due, and that default will be made in the payment of all of them; that there was due and payable November 1, 1919, the semi-annual interest on said bonds of the Jacksonville Electric Company, amounting to thirty-one thousand one hundred and twenty-five dollars ($31,125), and that the Jacksonville Traction Company, being without means to pay the interest and in order that there might not be any default, so as to enable the holders of the bonds to institute foreclosure proceedings, the receiver, relator herein, applied to the United States Court for the Southern District of Florida for an order to issue receive's certificates to borrow the necessary amount of money to pay said interest, so as to prevent said default, and the necessary order having been made by the court, the relator was able to borrow money upon such receiver's certificates to pay the interest on said bonds and prevent default thereof.

"That the Jacksonville Traction Company is operating its lines of railway within the city of Jacksonville under and by virtue of the provisions of an ordinance, No. 1-67, passed by the city council of the city of Jacksonville on the 15th day of January, 1907, and approved on the 26th day thereof, and that, among other things, it is provided in section five (5) of said ordinance that the fare to be charged by it for a continuous passage from

any point within the city limits to any other point within the city limits, on the lines of its said railways, shall not exceed five cents, and that free transfer tickets shall be given to passenger paying a five cent fare and accepted for carriage at intersecting points on the lines of the street railway or any other lines of street railway for the purpose of enabling them to make one continuous passage over the most direct route or routes.

"Further, that it is provided in section eight (8) of said ordinance that where streets are to be paved the traction company shall lay and maintain its tracks so as to conform to the surface of said streets, and when the city shall pave such streets, or parts thereof, said company shall pave the space between the rails and tracks and for two feet on each side thereof.

"That it is further provided in section four (4) of said ordinance that the traction company shall pay to the city of Jacksonville from and after the taking effect of the said ordinance, as a burden imposed by the ordinance and a condition and consideration therefor, and as a condition and consideration of the franchise, rights and privileges granted and confirmed by said ordinance, three per cent. of the gross earnings of all the street railway lines in the city of Jacksonville, held, acquired, constructed or operated by the traction company, which shall be paid in quarter-yearly installments, and this in addition to all other taxes imposed by law.

"That the Jacksonville Traction Company operates all of the lines of electric railway in the city of Jacksonville and territory contiguous thereto, and that there is no other system of electric railway or street railway in the city of Jacksonville and territory contiguous thereto except that of the Jacksonville Traction Company.

"That the financial results of the operation of the lines of railway herein referred to during the year 1918 showed gross earnings of nine hundred and forty-five thousand dollars ($945,000), operating expenses of six hundred and thirty-eight thousand, three hundred and thirty-six dollars and nineteen cents. ($638,336.19), taxes of seventy-one thousand, three hundred and thirty dollars and sixty-five cents ($71,330.65), interest charges of one hundred and seventy-five thousand, eight hundred and twenty-four dollars and ninety-five cents ($175,824.95), bond sinking fund of twenty-three thousand, two hundred and forty-one dollars and sixty-seven cents ($23,241.67), leaving a loss for the year, without taking into consideration any return to the owners of the property upon their money invested.   As compared with the earnings for the year 1914, the gross earnings increased two hundred and thirty thousand, three hundred and thirteen dollars and seventy-three cents ($230,313.73), or thirty-two per cent (32%), while the net balance decreased fifty-seven thousand, seven hundred and twenty-two dollars and ninety-three cents ($57,722.93), or sixty-one per cent. (61%) ; and such condition was brought about by an abnormal increase almost entirely in the cost of labor and materials necessary in the operation of the company, said total increase of expenses being two hundred and twenty thousand, eight hundred and forty-five dollars and twenty-one cents ($220,845.21) ; that on September 27, 1918, it became necessary for the company to make a large increase in wages, and that if wages had been paid during the whole of the year of 1918 at such increased rate, the result of the year's operation would have shown a tremendous deficit; that the said wage scale is now in force and effect as a necessary item of expense in the operation of said railway, and will continue in effect; that the price

of materials, instead of being reduced, is constantly being increased; and that the cost of operation of the railways operated by the traction company has largely increased instead of being decreased since the year 1918; that the rate of fare which the traction company is by said ordinance permitted to charge has not been increased, with the result that the operations of the company for the year 1919 show the gross receipts to be $1,024,527.03.

| | |
|---|---|
| Operating expenses, | $835,875.14 |
| Taxes, | 93,268.41 |
| Interest charges, | 174,965.80 |
| Bond sinking fund, | 24,271.66 |

Thus making a loss for the year 1919 of One Hundred and Three Thousand eight hundred and fifty-three and 98/100 dollars, ($103,853.98), without any provision for depreciation, up-keep, or obsolescence, or without any return whatever to the owners of the property for the money invested in the same. That the said company, being operated at a loss, its credit being impaired, so that it was unable to meet its obligations as they matured, or to provide the funds necessary for proper additions, betterments and improvements to its properties which were required to enable it to properly carry on its railway business, either through the borrowing of additional capital or from the earnings or income of its property, or otherwise, the traction company, on January 7, 1919, filed with the city council of the city of Jacksonville a petition asking that the said franchise ordinance should be so amended as to enable it to increase its rate of fare; that in order to verify its statements as to its financial condition and its earnings, as set forth in the petition, the city council appointed as auditors the firm of Mucklow & Ford to examine its books and other data and

to report to said city council; that said firm, who are well known and competent auditors doing business in the city of Jacksonville, made a complete and thorough examination lasting for several months and submitted a report showing that the earnings of the traction company for the year 1918 amounted to fifty thousand dollars less than its operating expenses and the payments for taxes and interest, without making any provision for depreciation, renewals or obsolescence, or without providing any return to the owners of the property upon their investment; and that if existing conditions continued it would be impossible for the traction company to continue its operations; that in view of the situation as shown by said report, the city council, on August 22, 1919, passed an ordinance so amending the franchise of the traction company as to authorize it to increase its rate of fare to seven cents for a period of two years and giving to the city of Jacksonville thereafter the right to regulate the passenger rates, which right it does not now have; that under the charter of the city of Jacksonville it was necessary that said ordinance be submitted to the people of said city for ratification or rejection; it was so submitted at a special election held on October 21, 1919, but the same was defeated.

"That, believing that the people of Jacksonville would grant the relief to the traction company that it was entitled to, the various creditors of the company refrained from instituting any proceedings against it pending said action being taken before the city council of the city of Jacksonville; but almost immediately thereafter, to-wit, on the 30th day of October, 1919, the General Electric Company filed a general creditor's bill against the Jacksonville Traction Company in the United States Court for the Southern District of Florida, and praying, among

other things, for the appointment of a receiver, and on the same date the judge of said court appointed the relator herein as receiver of the property of the Jacksonville Traction Company; that he immediatley qualified as such receiver, took immediate possession thereof, and has been operating said property ever since said time; that, as before stated said relator was compelled to borrow, upon receiver's certificates, the necessary amount of money to pay the interest on some of the bonds due on the 1st of November, 1919; and that since his appointment as receiver various petitions of intervention by other creditors have been filed in said mentioned proceedings, and that he has recently been advised by the city officials of the city of Jacksonville of the passage of an ordinance requiring the paving and re-paving of numerous streets upon which are located lines of railway operated by the traction company; and that in compliance with the requirements of the ordinance above alluded to, he is informed that the paving charges will amount to approximately one-half million dollars, upon the part of the traction company.

"That the tracks and the construction thereof, and the power houses, poles, lines, rolling stock, machinery and equipment of the Jacksonville Traction Company are, and have been of the best, and that no more modern machinery or equipment can be purchased or installed for the purpose of having a more economical operation of affairs; that the examination by the relator of the operations of the company for the past two years is such as that he avers that the operations of the company have been carried on as economically as possible; and that he is satisfied, from his examination of the situation, and from the operations of the company since he has had charge of it as an officer of the United States Court,

that it is utterly impossible to operate the same upon a
five cent fare; that being of this opinion, and further,
that it being the duty of the Railroad Commissioners of
the State of Florida to make reasonable rates and pas-
senger tariffs to be observed by all railroad, railroad com-
panies, and common carriers, doing business in this State,
and that the situation in the instant case was such as
that it was the duty of the Railroad Commissioners to
prescribe reasonable rates for the carriage of passengers
of the property that the relator has in charge, and that,
under the facts, it was its duty to grant the Jackson-
ville Traction Company the relief that it was entitled
to, the relator applied to the United States Court for the
Southern District of Florida for permission to apply to
the Railroad Commissioners of the State of Florida for
the relief that the Jacksonville Traction Company was
entitled to, and on the 12th day of January, 1920, the
United States Judge made an order authorizing and di-
recting said relator to apply to the Railroad Commis-
sioners for the necessary relief; that, in pursuance of said
order made by the United States Court, the relator did,
on the 19th day of January, 1920, apply, in the city of
Tallahassee, to the Honorable Railroad Commissioners of
the State of Florida for the necessary relief, setting forth
in his petition all of the statements hereinbefore and
hereinafter contained, and in addition thereto attach-
ing to the petition directed to the said Railroad Com-
missioners for relief a copy of the ordinance under which
the Jacksonville Traction Company is operating; a copy
of the bill of complaint under which the relator herein
was appointed receiver of the property of the Jackson-
ville Traction Company; a copy of the order appointing
the relator as receiver; a copy of the report made by
the auditors as to the financial condition of the company

and of its operations for the year 1918, and a copy of the ordinance passed by the city council amending the franchise of the traction company so as to increase its fare from five cents to seven cents; but, after a hearing upon said matter, although under the statutes of this State it is the duty of the Railroad Commissioners to make reasonable rates for the carriage of passengers by all railroads, railroad companies and common carriers, and, although, under the facts as stated hereinbefore and hereinafter, which were stated in said petition presented to the said Railroad Commissioners, it was their duty to grant the relief prayed for, the Railroad Commissioners, upon a hearing on the petition filed with them, to-wit, on the 19th day of January, 1920, held that they had no jurisdiction over the subject-matter contained in said petition, and for said reason denied the same.

"That the earnings of the company are insufficient to pay the unsecured indebtedness or interest on the same, or its operating expenses, or to provide for depreciation, up-keep or obsolescence, or any return to the owners of the property for the moneys invested; and that, although the relator is well satisfied, from an examination he has made of the situation, that the physical venue of the property, outside of any element of good will or franchise value, amounts in dollars and cents to far more than all of the indebtedness, stock and securities of the company, yet, by reason of the fact that the fare is utterly inadequate to enable the company to carry on its operations and keep on as a going concern, its credit is such as that it is unable to fund its unfunded indebtedness or to pay the same, and the relator is satisfied and avers it to be a fact that, unless the fare is immediately and without delay increased so as to enable it to pay its operating expenses and to have a sufficient sum of

money to make renewals, provide for obsolescence and depreciation, and to carry on its operations so as to enable it to fund its unfunded indebtedness; or to pay the same, the United States Court will not permit, for an indefinite time, the borrowing of money upon receiver's certificates to pay the interest on the bonded and other indebtedness to prevent default in the same, and in consequence thereof the holders of the bonds will institute foreclosure proceedings, and, when carried to a conclusion, the property will be sold and dismembered, the people of Jacksonville and of the territory contiguous thereto be deprived of, the only means of railway passenger transportation that they have, and the creditors and the stockholders without any relief whatsoever; and that it is imperative, in order that said transportation system may be maintained for the benefit of the public, that it may be kept going as a going concern, and not dismembered, and that the stockholders and creditors and owners of the property may be protected, that this honorable court assume original jurisdiction of said petition and of the matters therein contained, and immediately issue an alternative writ directed to the Railroad Commissioners of the State of Florida, commanding them without delay to perform their statutory duty of fixing just and reasonable rates for the carriage of passengers on the railway lines operated by the relator, and not force the relator to apply for this relief through the lower courts with the fatal delay incident to the pursuit of such a course. That the relief required the relator must have now. That a few weeks' delay may be fatal to this entire situation.

"That the relator is entirely without remedy in the premises unless it is afforded by the interposition of this honorable court by writ of mandamus; and praying that

a writ of mandamus be issued against the Honorables R. Hudson Burr, Newton A. Blitch and Royal C. Dunn, as Railroad Commissioners of the State of Florida, commanding and requiring them to immediately take jurisdiction of the petition before mentioned and presented to them requesting an increase in fare for the carriage of passengers, and that they perform their statutory duty of fixing just and reasonable rates for the carriage of passengers by the Jacksonville Traction Company being operated by the relator as receiver.

"NOW, THEREFORE, we being willing that full and speedy justice shall be done in the premises, do command that you, the said R. Hudson Burr, Newton A. Blitch and Royal C. Dunn, as an constituting the Railroad Commissioners of the State of Florida, immediately take jurisdiction of the petition before mentioned and presented to you requesting an increase in fare for the carriage of passengers, and that you perform your statutory duty of fixing just and reasonable rates for the carriage of passengers by the Jacksonville Traction Company being operated by the relator as receiver, or that you appear before us as Justices of the Supreme Court of the State of Florida, at Tallahassee, on the 5th day of February, A. D. 1920, at 10 o'clock in the forenoon, to show cause why you should refuse so to do.

WITNESS the Honorable JEFFERSON B. BROWNE, Chief Justice of the Supreme Court of Florida and the Seal of said (SEAL)    Court at Tallahassee, this 20th day of January, A. D. 1920.

G. T. WHITFIELD,

Clerk Supreme Court, State of Florida."

The order of the Railroad Commissioners is as follows:

"ORDER NO. 683,

FILE NO. 4097.

"BEFORE THE RAILROAD COMMISSIONERS OF THE STATE OF FLORIDA.

In the Matter of the Application of E.
J. Triay, Receiver of the Jacksonville
Traction Company for the Railroad
Commissioners to fix and establish fares
and charges for said Company.

"In the above matter the Railroad Commissioners of the State of Florida have been petitioned by E. J. Triay as Receiver of the Jacksonville Traction Company, to assume jurisdiction over the rates, fares, charges and practices of the said Jacksonville Traction Company, and to authorize an increase in its rates and fares in Jacksonville, Florida. The matter came on for hearing before the Railroad Commissioners on the 19th day of January, 1920, at 10 o'clock in the morning, at their offices in the city of Tallahassee, the Capital, and then and there appeared E. J. Triay, as aforesaid, J. L. Doggett and P. O. Knight, Attorneys for the Receiver. There also appeared P. H. Odom, City Attorney of Jacksonville, Florida, representing the city of Jacksonville in opposition to said petition. The Commissioners having heard all interested parties who desired to be heard took the said matter under advisement.

"And now on this date the said matter coming on for further consideration, and the Commissioners being fully advised in the premises, find and conclude that they have no jurisdiction over the subject matter contained in said petition.

"WHEREFORE, it is CONSIDERED, ORDERED AND ADJUDGED by the Railroad Commissioners of the State of Florida, that the petition of E. J. Triay, Receiver of the Jacksonville Traction Company, this date filed, asking the Railroad Commissioners to fix and establish rates, fares and charges for said Company in Jacksonville, Florida, be and the same is hereby denied for the reason above stated.

"DONE AND ORDERED by the Railroad Commissioners of the State of Florida, in session at their office in the City of Tallahassee, the Capital, this 19th day of January, A. D. 1920.

R. HUDSON BURR,<br>Chairman."

Respondents filed the following motion to quash:

"Now comes R. Hudson Burr, Newton A. Blitch and Royal C. Dunn, as Railroad Commissioners of the State of Florida, by Dozier A. DeVane, Special Counsel, and P. H. Odom, City Attorney for Jacksonville, Florida, and moves the Court to quash the Alternative Writ of Mandamus issued in the above entitled cause on the 20th day of January, 1920, and for ground for said motion assign the following:

"1st. No jurisdiction over the subject matter set forth in said Alternative Writ of Mandamus has been either expressly or impliedly conferred upon the Railroad Commissioners of the State of Florida.

"2nd. That the Writ fails to show a clear prima facie case in the relator that entitles him to the relief prayed."

The following constitutional and statutory provisions have a bearing on the case:

"The Legislature is invested with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, or performing other services of a public nature; and shall provide for enforcing such laws by adequate penalties or forfeitures." Sec. 30, Art. XVI, Constitution, 1885.

"The Legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time. When any municipality shall be abolished, provision shall be made for the protection of its creditors." Sec. 8, Art VIII, Const.

"The Legislature shall establish a uniform system of county and municipal government, which shall be applicable, except in cases where local or special laws are provided by the Legislature that may be inconsistent therewith." Sec. 24, Art. 111, Const.

Chapter 4549, Acts of 1897, entitled "AN ACT to Provide for the Regulation of the Railroad Schedules, Freights, Express, Sleeping Car and Passengers' Tariffs, and Building of Freight and Passenger Depots in This State; to Prevent Unjust Discrimination in the Rates Charged for the Transportation of Passengers and Freight, and to Prohibit Railroad Companies, Corporations, Persons and All Common Carriers in This State from Charging Other Than a Just and Reasonable Rates, and to Enforce the Same; and to Prescribe a Mode of Procedure and Rules of Evidence in Relation Thereto; and to Provide for the Appointment and Election of Commissioners, and to Prescribe Their Duties and Powers," contains: "Sec. 5. The provisions of this chapter shall

apply to the transportation of passengers and property, and to the receiving, delivery, storage and handling of property wholly within this State, and shall apply to all railroad corporations and railroad companies engaged in this State in the transportation of passengers or property by railroads therein from any point within this State to any point within this State. The term 'railroad' as used in this act shall include all bridges and ferries used or operated in connection with any railroad operated wholly or in part within this State, and also all the road in use by any corporation, receiver, trustee or other person operating a railroad, whether operated under any contract agreement, lease or otherwise, and the terms 'railroad corporation' or 'railroad company,' as used in this act, shall be deemed and taken to mean all corporations or individuals, express companies and sleeping car companies included, now owning or operating, or which may hereafter own or operate any railroad in whole or in part in this State, and the provisions of this act shall apply to all persons, firms and companies, and to all associations of persons, whether incorporated or otherwise, that shall do business as common carriers upon any of the lines of railroads in this State (street railroads excepted) the same as to railroad corporations hereinbefore mentioned."

Chapter 4700, Acts of 1899, entitled "AN ACT to Revise and Amend" Chapter 4549, with some additions to the title superseded Chapter 4549, Acts of 1897, and the provisions of Chapter 4700 were re-enacted as Sections 2882 to 2924, General Statutes of 1906.

Section 5, Chapter 4700, re-enacted as Sections 2890, 2891, and 2892, General Statutes, provides: "The provisions of this chapter shall apply to the transportation

of passengers and property and to the receiving, delivery, storage and handling of property wholly within this State, and shall apply to all railroad corporations, railroad companies and common carriers engaged in this State in the transportation of passengers or property by the railroads, or common carriers therein, from any point within this State to any point within this State. The term 'railroad' as used in this act shall include all bridges and ferries, used or operated in connection with any railroad operated wholly or in part in this State, all passenger terminal companies or union depot companies, whether operating train service or not; and also all the road in use by any corporation, receiver, trustee, or any other person operating a railroad, whether operated under any contract, agreement, lease or otherwise, and the term 'railroad corporation or railroad company,' as used in this act, shall be deemed to mean all corporations, associations, partnerships, trustees, agents, assignees and individuals; all express companies and sleepieng car companies included, now owning or operating, or which may hereafter own or operate any railroad in whole or in part in this State, or owning or operating any train or car service on any railroad in this State. Whenever any railroad company owns and operates in connection with its road, and for the purpose of transporting its cars, freight or passengers, any steamer or other water craft shall be deemed a part of its said road. The term 'common carrier,' as used in this Act, shall be deemed to mean and include: 1st. All companies and any person or persons owning and operating rairoads wholly or partly within this State. 2d. All companies and any person or persons owning and operating steamships engaged in the transportation of freight or passengers from and to ports within this State. 3d. All companies and any person or

persons owning and operating steamboats used in the transportation of freight or passengers upon the rivers or inland waters of this State. ' 4th. All companies and any person or persons owning or operating railroads, passenger terminals or union depots for the purpose of receiving, delivering· or transferring passenger traffic to and from the place or city in which said terminal or union depot may be situated, or to or from one or more of the railroads operating its train service into said terminal or depot from or to any other such railroad or railroads; whenever any steamship or steamboat company owns and operates any barge, canal boat, steam tug, ferry boat or lighter, in connection with its ships or boats, the thing so owned and operated shall be deemed a part of its main line."

Chapter 6527, Acts of 1913, entitled "AN ACT to Amend Sections 2890, 2891, 2893, 2894, 2896, 2899, 2900, 2901, 2903, 2904, 2905, 2908, 2910, 2914, 2917, 2918 and 2924 of the General Statutes of this State Relating to the Railroad Commissioners and the Regulation of Common Carriers" contains among its provisions the following:

"2890. Application of Act. The provisions of this Chapter shall apply to the transportation of passengers and property and to the receiving, delivering, storage and handling of property wholly within this State and shall apply to all railroads, railroad companies and common carriers engaged in this State in the transportation of passengers or property by railroads or common carriers therein from any point within this State to any point within this State."

"2891. Definitions. The term 'railroad' as used in this Chapter shall include all bridges and ferries used or operated in connection with any railroad, and also all the

road in use by any corporation, association, partnership, receiver, trustees or any other person operating a railroad, whether owned or operated under a contract, agreement, lease or otherwise; also all switches, spurs, tracks and terminal facilities of every kind used or necessary in the transportation of persons or property; also all freight and passenger depots, yards and grounds used or necessary in the receiving, handling, transportation and delivery of passengers and freight; also all terminal companies or union depot companies, passenger or freight, whether operating train service or not. The term 'railroad corporation' or 'railroad company' as used in this Chapter shall be deemed to mean all corporations, associations, partnerships, receivers, trustees or any other persons now owning or operating or which may hereafter own or operate any railroad in whole or in part in this State or own or operate any express service or train, or car service, including sleeping car, parlor car and dining car service on any railroad in this State." The definition of "common carrier" remains as stated in Chapter 4700, *supra*. Sec. 2892, General Statutes, and Compiled Laws.

"2893. Powers and Duties of Commissioners. It shall be the duty of said Commissioners:

"1. To make reasonable and just rates of freight and passenger tariffs to be observed by all railroads, railroad companies and common carriers doing business in this State over their respective lines.

"12. To regulate all other matters pertaining to the receiving, handling, care, transportation and delivery of property, and to the safety, care, comfort, convenience, proper accommodation and transportation of passengers that shall be for the good of the public. The operation of this general grant or of any other general grant of

power in this chapter shall not be held to be limited by the grants of specific powers.

"13.   To prescribe all rules and regulations appropriate for the execution of any of the powers conferred upon them by law either in express terms or by implication,

.  *   and all doubts as to their jurisdiction and powers shall be resolved in their favor, it being intended that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest."

"2899.   To Furnish Corporations With Schedules of Just and Reasonable Rates.  Said Commissioners shall make and furnish to each common carrier doing business in this State, as soon as practicable, a printed or written schedule of just and reasonable rates and charges for transportation of freights, passengers and cars on its transportation line or lines under its control or management, and such schedule, certified by the Chairman of the Commissioner, shall be admitted in evidence without necessity for other proof, and shall in all suits brought against any common carrier wherein is involved the rates of any such common carrier for the transportation of freight of any description or charges for the transportation or use of any kind of car upon the tracks of any railroad or of any of the branches thereof, or for the transportation of any passenger or passengers, or for any unjust discrimination, in relation thereto, be deemed and taken in all the courts of this State as prima facie evidence that the rates fixed in such schedule or schedules are just and reasonable rates of charges for the transportation of freight, cars and passengers upon the transportation lines of said carrier and said Commissioners shall,

as often as circumstances may require, change or revise any schedule or schedules and furnish all common carriers doing business in this State with notice of such changes or revisions and such notice shall state the time when such changes of revisions shall go into effect." Secs. 2890, 2891, 2893, 2899, Compiled Laws of 1914.

WHITFIELD, J. (*After stating the facts*)—The alternative writ of mandamus issued herein commands the Railroad Commossioners to fix just and reasonable rates for passengers on a street railroad in the city of Jacksonville, Florida, or to show cause for not doing so. On a motion to quash the alternative writ, it is in effect contended that under the law the tariff rates of transportation to be charged by the relator are fixed by an ordinance of the city of Jacksonville, and that the statutes of the State do not confer upon the Railroad Commissioners authority to make passenger rates for street railroads. It is appropriate that the city be heard in this proceeding, and its counsel joined in the motion to quash, and participated in the argument and has filed briefs. See City of Gainesville v. Gainesville Gas & Electric Power Co., 66 Fla. 404, 62 South. Rep. 919; Southern Public Utilities Co. v. City of Charlotte, —— N. C. ——, 101 S. E. Rep. 619; State *ex rel.* Indianapolis Traction Co. v. Lewis, —— Ind. —— 120 N. E. Rep. 129.

When a tribunal refuses to exercise jurisdiction that it clearly possesses and ought to exercise, mandamus is the proper remedy to compel its exercise. State *ex rel.* Birmingham T. & S. Co. v. Reeves, 44 Fla. 179, 32 South. Rep. 814; *Ex Parte* Henderson, 6 Fla. 279; Anderson v. Brown, 6 Fla. 299; See also State *ex rel.* Lamson v. Baker, 25 Fla. 598, 6 South. Rep. 445; State v. Crawford, 28 Fla. 441, 10 South. Rep. 118; State *ex rel.* Colcord v.

Young, 31 Fla. 594, 12 South. Rep. 673; State ex rel. Sanchez v. Call, 36 Fla. 305, 18 South. Rep. 771; State ex rel. Duke v. Wills, 49 Fla. 380, 38 South. Rep. 289; State ex rel. McKinnon v. Wolfe, 58 Fla. 523, 50 South. Rep. 511; State ex rel. Carter v. Sheats, 73 Fla. 176, 544, 74 South. Rep. 638, 641. See also 4 A. L. R. 582.

The Railroad Commissioners are administrative officers having statutory powers and duties; and when they decline to exercise authority or to perform duties conferred upon them by law, they may by mandamus, in the absence of other adequate remedy afforded by law, be required in proper cases duly presented to proceed with the performance of their duties. In such cases the command is to proceed to exercise their authority and discretion.

Municipalities may exercise only such powers as are clearly conferred upon them by the express or implied provisions of law; and all doubts as to the existence of a power in a municipality is resolved against the city. Malone v. City of Quincy, 66 Fla. 52, 62 South. Rep. 922; State ex rel. Ellis v. Tampa Water Works Co., 56 Fla. 858, 47 South. Rep. 358, 19 L. R. A. (N. S.) 183; 1 Dillon Munc. Corp. (5th Ed.) Sec. 237; 28 Cyc. 265. This rule was applicable to statutes conferring authority upon the Railroad Commissioners until the enactment of Chapter 6527, Acts of 1913, which provides that "the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally" and that "all doubts as to their jurisdiction and powers shall be resolved in their favor." Sec. 2893 Comp. Laws, 1914; State ex rel. Burr v. Jacksonville Terminal Co., 71 Fla. 295, 71 South. Rep. 474; State ex rel. Railroad Com'rs. v. Atlantic Coast Line R. Co., 60 Fla. 465, 54 South. Rep.

394; State *ex rel.* Railroad Com'rs. v. Southern Tel. & Const. Co., 65 Fla. 270, 61 South. Rep. 506; State *ex rel.* Railroad Com'rs. v. Louisville & N. R. Co., 57 Fla. 526, 49 South. Rep. 124.

"That a city has no power to regulate rates of this character unless it has legislative authority so to do is established, and does not seem to be disputed.   Indepently of a right to regulate and control the rates to be charged for public service reserved in a grant of a franchise or right to use the city streets, a city or other municipality has no power to regulate the rates to be charged by public service corporations in the absence of express or plain legislative authority to do so.   3 Dillon on Municipal Corporation (5th Ed.) Sec. 1325. Nor does such authority arise from the power to regulate the opening and use of streets, nor a grant of the general right to control and regulate the right to erect works in the streets of the city.   State v. Missouri & K. Telephone Co., 189 Mo. 83, 88 S. W. Rep. 41; Jacksonville v. Southern Bell & Tel. Co., 57 Fla., 374, 49 South. Rep. 509; Lewisville Natural Gas Co. v. State, 135 Ind. 49, 34 N. E. Rep. 702, 21 L. R. A. 734; Mills v. Chicago (C. C.) 127 Fed. Rep. 731; State v. Sheboygan, 111 Wis. 23, 86 N. W. Rep. 657." City of Winchester v. Winchester Water Works Co., —— U. S. ——, 40 Sup. Ct. Rep. 123.

Where it is doubtful whether a statute authorizes a municipality to fix rates for a public utility company, such doubt must be resolved against the authority of the city.   Milwaukee Electric Ry. & Light Co. v. Railroad Commission of Wisconsin, 238 U. S. 174, 35 Sup. Ct. Rep. 820; Home Telephone & Telegraph Co., v. City of Los Angeles, 211 U. S. 265, text 273, 29 Sup. Ct. Rep.

50; City of Jacksonville v. Southern Bell Telephone & Telegraph Co., 57 Fla. 374, 49 South. Rep. 509; State Public Utilities Commission v. City of Quincy, —— Ill. 125 N. E. Rep. 374; Puget Sound Traction Co. v. Reynolds, 244 U. S. 574, —— Sup. Ct. Rep. ——; In re. Seaport Water Co., —— Me. ——, 108 Atl. Rep. 452; 248 U. S. 294.

Even if authority is by statute given to a municipality to fix rates for a public service corporation operating therein, such authority is subject to legislative action. Section 30, Article XVI; City of Tampa v. Tampa Water Work Co., 45 Fla. 600, 34 South. Rep. 631, affirmed in 199 U. S. 241, 26 Sup. Ct. Rep. 23. See also Section 8, Article VIII of the Constitution; Gainesville Gas & Electric Power Co. v. City of Gainesville, 63 Fla. 425, 58 South. Rep. 785; City of Manitowoc v. Manitowoc & Northern Traction Co., 145 Wis. 13, 129 N. W. Rep. 925; City of Pawhuska v. Pawhuska Oil & Gas Co. 250 U. S. ——, 39 Sup. Ct. Rep. 526.

If there is a general law conferring upon municipalities authority to fix rates for street railroads and also a special law conferring a similar power upon a particular city, being inconsistent with the general law, the special or local law prevails as to the city to which it applies. Sec. 24, Art. III Const.; Sanders v. Howell, 73 Fla. 563, 74 South. Rep. 802; Ferguson v. McDonald, 66 Fla. 494, 63 South. Rep. 915.

The provisions of Chapter 4052, Laws of Florida, a general law entitled "An Act providing for the forfeiture of franchises," etc., re-enacted as Sections 1024-8, General Statutes of 1906, relate to forfeitures of franchises and do not purport to confer upon municipalities authority

to fix rates or even to grant franchises to public utility corporations, therefore, that statute does not authorize municipalities to fix tariff rates for street railroads.

Chapter 4859, Acts of 1899, Section 1016, General Statutes of 1906, limits to 30 years the "term" for which a municipality may grant a franchise or right to use the streets of the municipality for stated purposes, and it does not expressly or by implication confer a right to fix street car fares.

By its charter the city of Jacksonville is given the "power by ordinance    *    to grant the right of way through the streets, avenues and squares of said city for the purpose of street or other railroads." Sec. 4, Chap. 3775, Acts 1887, pp. 166-7.

The provisions of Chapter 5347, Acts of 1903, amending the charter of the city of Jacksonville, do not confer upon the city authority to fix rates of fares for street railroads, though it does confer power with reference to the use of the streets and viaducts by street railroads.

Any contract ordinance passed by the city with statutory authority fixing by agreement street car fares, as an incident to the granting of franchises to a street railroad company, is subject to legislative control. City of Tampa v. Tampa Water Works Co., *supra.* See also State *ex rel.* Ellis v. Atlantic Coast Line R. R. Co., 52 Fla. 646, 662, 41 South. Rep. 705, 12 L. R. A. (N. S.) 506; Southern Public Utilities Co. v. City of Charlotte, *supra;* Producers Transportation Co. v. Railroad Commission of the State of California, —— U. S. ——, —— Sup. Ct. Rep. ——, L. R. A. (Ed. Feb'y 1st, 1920, p. 166) ; State *ex rel.* Indianapolis Traction & Terminal Co. v. Lewis,

*supra;* City of St. Louis v. Public Service Commission of Missouri, —— Mo. ——, 207 S. W. Rep. 799; City of Memphis v. Enloe, —— Tenn. ——, 214 S. W. Rep. 71; Robertson v. Wilmington & P. Traction Co., —— Del. ——, 104 Atl. Rep. 839; Westinghouse Electric & Mfg. Co. v. Binghampton Ry. Co., 255 Fed. Rep. 378; Salt Lake City v. Utah L. & T. Co., —— Utah ——, 173 Pac. Rep. 556, P. U. R. 1918F 377, 3 A. L. R. 715 and note; 153 Wis. 592; 168 N. W. 481; 173 Pac. 799; 118 N. E. 531.

All regulations and contracts relative to transportation rates for common carriers, whether made by legislative authority or otherwise, are subject to a proper exercise of the police power of the State, under which power such rates may from time to time be increased or reduced or otherwise regulated as the interests of the public and the organic property rights of the carriers may require. The inherent and reserved power of the State cannot be abrogated by legislative enactment. State Pub. Util. Comm. v. City of Quincy, —— Ill. ——, 125 N. E. Rep. 374; Union Dry Goods Co. v. Georgia Public Service Corp. 248 U. S. 372, —— Sup. Ct. Rep. ——. See also Chicago & A. R. Co. v. Tranbarger, 238 U. S. 67, 35 Sup. Ct. Rep. 678; Mill Creek Coal & Coke Co. v. Public Service Corp., —— W. Va. ——, 100 S. E. Rep. 557; Black v. New Orleans Ry. & Light Co., —— La. ——, 82 South. Rep. 81; Atlantic Coast Line R. Co. v. City of Goldsboro, North Carolina, 232 U. S. 548, 34 Sup. Ct. Rep. 364; Portland Ry., Light & Power Co. v. Railroad Commission of Oregon, 229 U. S. 397, 33 Sup. Ct. Rep. 820; Chicago & A. R. Co. v. Tranbarger, 238 U. S. 67, 35 Sup. Ct. Rep. 678; Manigault v. Springs, 199 U. S. 473, 26 Sup. Ct. Rep. 127; 6 R. C. L. p. 190; Denver & South.

Platte Ry. Co. v. Englewood, 62 Col. 229, P. U. R. 1916E, 134, 161 Pac. Rep. 151, 4 A. L. R. 956; 4 A. L. R. 730.

Section 30, Article XVI of the State Constitution, expressly recognizes and does not limit the power of the Legislature to enact laws for the regulation and control of rates charged by common' carriers; and the power may be exercised notwithstanding statutory or municipal regulations or private contracts that may have been made with reference to such rates. State *ex rel.* Railroad Com'rs. v. Florida East Coast R. Co., 57 Fla. 522, 49 South. Rep. 43; City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 South. Rep. 631, affirmed in 199 U. S. 241, 26 Sup. Ct. Rep. 23; State *ex rel.* Lamar v. Jacksonville Terminal Co., 41 Fla. 377, 27 South. Rep. 225.

Under Section 8, Article VIII of the Constitution, set out in the statement, the jurisdiction and powers conferred by statute upon municipalities may be altered or amended at any time by the Legislature.

The alternative writ alleges, and the motion to quash admits, that "the Jacksonville Traction Company is operating its lines of railway within the City of Jacksonville under and by virtue of the provisions of an ordinance No. 1-67, passed by the City Council of the City of Jacksonville on the 15th day of January, 1907, and approved on the 26th day thereof, and that, among other things, it is provided in Section five (5) of said ordinance that the fare to be charged by it for a continuous passage from any point within the city limits to any other point within the city limits, on the lines of its said railways, shall not exceed five cents."

This ordinance, if otherwise effective as between the parties, is not controlling as against the State acting

through any authorized government agency to effectuate its inherent power that is expressly recognized by the provisions of Section 30, Article XVII, of the Constitution, as interpreted in the City of Tampa v. Tampa Water Works Co., *supra*. See also City of Manitowoc v. Manitowoc & Northern Traction Co., *supra*.

The question here presented is not whether under Section 30, Article XVI, of the Constitution, the Legislature may authorize a municipality to prescribe rates for a public utility service in disregard of the rights of the company in rates that had been fixed by contract between a public utility company and a municipality, as in City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 South. Rep. 631, affirmed in 199 U. S. 241, 26 Sup. Ct. Rep. 23.

But the question here is whether the Railroad Commissioners, a governmental agency, if authorized by statute to do so, may, *at the instance of a public utility company*, be required to proceed with the exercise of their authority in prescribing rates for the company's public service in disregard of a rate that has been fixed by contract between a municipality and the public utility company. Can the State waive or surrender the rights of a municipality and of the public in rates for service rendered by a public utility company, where such rates have been fixed by an ordinance in granting franchises to the public utility company? The State in its sovereignty authoritatively represents the public and it controls its municipalities; therefore the rights of the public and of municipalities in rates charged by. public utility corporations are subject to control and disposition by the governing power of the State. See Note 3 A. L. R. 730, 742; City of Pawhuska v. Pawhuska Oil & Gas Co., 250

U. S. ——, 39 Sup. Ct. Rep. 526; Dubuque Electric Co. v. City of Dubuque, 260 Fed. Rep. 353. See also State *ex rel.* Moodie v. Bryan, 50 Fla. 293, text 358, 39 South. Rep. 929; Boise City v. Boise Artesian Hot & Cold Water Co., 230 U. S. 84, 33 Sup. Ct. Rep. 997; Leiper v. B. & P. R. Co. 262 Pa. 328; 102 Alt. 901, 105 Atl. 209; 104 Atl. 839; 210 S. W. 381; 255 Fed. 295; 224 Mass. 463, 196 U. S. 539; 207 U. S. 161; 108 Atl. 452; 459.

Unless the State by constitutional provision (as is the case in this State) or by other reservation duly made, retains the right to change rates for public service fairly and reasonably made by a duly authorized and valid contract between a public utility company, and a municipality, the obligation of the contract cannot in general be lawfully impaired by subsequent legislation in so far as it *injures contract rights of the company* that have not been waived or in any way terminated. See Detroit United Railway v. City of Detroit, 242 U. S. 238, —— Sup. Ct. Rep. ——; Vicksburg v. Vicksburg Water Works Co., 206 U. S. 496, 27 Sup. Ct. Rep. 762; Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S. 265, 29 Sup. Ct. Rep. 50; Cleveland v. Cleveland City R. Co., 194 U. S. 517, 24 Sup. Ct. Rep. 756. See also Von Hoffman v. City of Quincy, 4 Wallace (U. S.) 535; Vicksburg v. Vicksburg Water Works Co. 202 U. S. 453, 26 Sup. Ct. Rep. 660; Sioux City St. Ry. Co. v. Sioux City, 132 U. S. 98, 11 Sup. Ct. Rep. 226. As to the rights of the city and of the public, in contract rates, where the State has not interposed its authority, see Columbus Railway, Power & Light Co. v. City of Columbus, 249 U. S. 399, —— Sup. Ct. Rep. ——; Miami Gas Co. v. Highleyman, 77 Fla. 523, 81 South. Rep. 775; City of Manitowoc v. Manitowoc & Northern Traction Co., 145 Wis.

13, 129 N. W. Rep. 925. But the rights of the munici-
pality and of the public under the contract are subject
to governmental control; and such rights of the munic-
ipality and of the public may be modified or waived or
surrendered by law. See City of Pawhuska v. Pawhuska
Oil & Gas Co., *supra*; Dubuque Electric Co. v. City of
Dubuque, *supra*. The constitution protects lawful and
valid contract rights of private parties against illegal
impairment by legislation; but the organic law, State or
Federal, does not forbid legislative control of the rights
of the public in the rates to be charged by common car-
riers, even though such rates may be fixed by contract
between the carrier and a municipality. If the contract
rights of a public service corporation as to tariff rates
are subject to the fair exercise of the police power of the
State and Section 30, Article XVI, of the State Consti-
tution, certainly the rights of municipalities and of the
public in such rates are subject to the police power of
the State and to stated organic provisions and to sta-
tutes enacted thereunder. See Conery v. New Orleans
Water Works Co., 142 U. S. 79, 12 Sup. Ct. Rep. 142;
Hunter v. City of Pittsburg, 207 U. S. 161, text 179, 28
Sup. Ct. Rep. 40; City of Worcester v. Worcester Con-
sol. St. R. Co., 196 U. S. 539, 25 Sup. Ct. Rep. 327; City
of Springfield v. Springfield St. R. Co., 182 Mass. 41, 64
N. E. Rep. 577; Sec. 8 Art. 8, Constitution.

In the absence of express organic limitations, the
police power of the State may be exercised in making
just and reasonable rates to be charged by common car-
riers for the transportation of passengers and property;
and all private contracts for such transportation in so
far as they affect public rights, are in law made subject
to a proper exercise of the police power of the State

within organic limitations. Chicago, Burlington & Quincy R. R. Co. v. Iowa, 94 U. S. 155; Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, —— Sup. Ct. ——; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. Rep. 265; Producers v. Railroad Com'rs. —— U. S. —, 40 Sup. Ct. Rep. 131. The organic law of this State contemplates the exercise of this power. Sec. 30, Art. XVI, Constitution; City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 South. Rep. 631, affirmed in 199 U. S. 241, 26 Sup. Ct. Rep. 23; Reeder on Validity of Rate Regulations, Sec. 196. See also City of Gainesville v. Gainesville Gas & Electric Power Co., 65 Fla. 404, 62 South. Rep. 919.

Where full legislative authority is clearly conferred and there is no reservation of power in the organic law, and pursuant thereto a municipality enters into a reasonable and valid contract with a public utility company for the rendering of service to the public at stated rates, such contract rates may be secured to the company under organic law against violation by the State. Minneapolis v. Minneapolis St. R. Co., 215 U. S. 417, 30 Sup. Ct. Rep. 118; Vicksburg v. Vicksburg Water Works Co., 206 U. S. 496, text 508, 27 Sup. Ct. Rep. 762. See also City of Owensboro v. Cumberland Telephone & Telegraph Co., 230 U. S. 58, 33 Sup. Ct. Rep. 988. But where the city does not have full and clearly conferred authority to make a binding contract with a public utility company as to rates charged the public, (Rogers Park Water Co. v. Fergus, 180 U. S. 624, 21 Sup. Ct. Rep. 490; City of Jacksonville v. Southern Bell Telephone & Telegraph Co., 57 Fla. 374, 49 South. Rep. 509), or where the organic law reserves to the State the right at any time to regulate rates charged by public utilities (Tampa Water

Works Co. v. Tampa, 199 U. S. 241, 26 Sup. Ct. Rep. 23;
City of Tampa v. Tampa Water Works Co., 45 Fla. 600,
34 South. Rep. 631; Sioux City St. Ry. Co. v. Sioux City,
*supra*; San Antonio Traction Co. v. Algelt, 200 U. S.
304, 26 Sup. Ct. Rep. 261; Puget Sound Traction, Light
& Power Co. v. Reynolds, 244 U. S. 574, —— Sup. Ct.
Rep.; Knoxville Water Co. v. Knoxville, 189 U. S. 434,
23 Sup. Ct. Rep. 531.) the State, in the exercise of its
police power, may reduce or increase the rates without
reference to and independently of. and notwithstanding
the ordinance contract or rights thereunder claimed by
the company or by the municipality or the public, when
justice and the general welfare demands it.  See Union
Dry Goods Co. v. Georgia Public Service Corporation,
248 U. S. 372, —— Sup. Ct. Rep. ——; State *ex rel.*
Indianapolis Traction & Terminal Co. v. Lewis, —— Ind.
——, 120 N. E. Rep. 129; Southern Public Utilities Co.
v. City of Charlotte, —— N. C. ——, 101 S. E. Rep. 619;
Salt Lake City v. Utah L. & T. Co., —— Utah ——,
P. U. R. 1918F, 377, 173 Pac. Rep. 556, 3 A. L. R. 715
and Note; United States v. Uncle Sam Oil Co., 234 U. S.
548, 34 Sup. Ct. Rep. 956; Reader on Rate Regulations,
Sec. 196, p. 340.

A continuance of adequate, efficient service by public
utilities, particularly by street railroads in a growing
city, vitally affects the public welfare.  In granting to
corporations franchises to engage in the business of
common carriers, the law contemplates a continuance of
the public service, unless otherwise provided; and the
law also contemplates an adequate and efficient service
and that a reasonable compensation therefor shall be
allowed, to comport with organic property rights. (City
of Gainesville v. Gainesville Gas & Electric Power Co.,

65 Fla. 404, 62 South. Rep. 919; Brooks S. Co. v. Railroad Commissioners, —— U. S. ——, 40 Sup. Ct. Rep. ——, March 1, 1920; Minneapolis, St. P. & S. S. M. R. Co. v. State of North Dakota *ex rel.* McCue, 236 U. S. 585, 35 Sup. Ct. Rep. 429; Norfolk & W. R. Co. v. Attorney General of State of West Virginia, 236 U. S. 605, 35 Sup. Ct. Rep. 437) ; therefore, it is clearly within the legislative power and duty to enact regulations by which a reasonable return  for service rendered  by common carriers may be effectuated as well as to enact regulations by which excessive charges and unjust discriminations by common carriers may be prevented and redressed. See Southern Public Utilities Co. v. City of Charlotte, *supra;* State *ex rel.* Indianapolis Traction & T. Co. v. Lewis, —— Ind. ——, 120 N. E. Rep. 129.

In the exercise of the power expressly recognized in Section 30, Article XVI, of the Constitution, to pass laws upon the subject, the Legislature enacted statutes as shown by the titles "to provide for the regulation of * passenger tariffs," "to prohibit railroad companies, corporations, persons and all common carriers in this State from charging other  than just and reasonable rates," and "relating to the Railroad Commissioners and the regulation of common carriers." See Chap. 4549, Laws of Florida, Acts of 1897; Chap. 4700, Acts of 1899; Secs. 2882 *et seq.* Gen. Stats. 1906; Chap. 6527, Acts of 1913; Secs. 2882 *et seq.* Comp. Laws, 1914.

"While there is a similarity between railroads and street-railroads, there is also a difference. Some courts, emphasizing the similarity, hold that in statutes the word 'railroad' includes street railroad, unless the contrary is required by the context. Others, emphasizing the similarity, hold that 'railroad does not include street

railroad unless required by the context.' " Omaha & G. B. St. R. Co. v. Interstate Commerce Commission, 230 U. S. 324, text 335, 33 Sup. Ct. Rep. 890.

This court, observing the similiarity between a railroad and a street railroad, has construed statutes that in terms refer to "railroads" to include street railroads.

The terms "manager of any railroad company or receiver of any railroad," as used in Chapter 4115, Acts of 1893, were held to apply to a street railroad, pursuant to an application of the principles of law that "the word *railroad,* in its broadest signication, includes a street railroad. When the word is used in a statute there is no definite rule of construction as to whether it includes street railroads. It may, or it may not, include them. The meaning of the word must depend upon the context and the general intent of the statute in which it is used." Bloxham v. Consumers' Electric Light & St. R. Co., 36 Fla. 519, 18 South. Rep. 444, 22 R. C. L. 745; Arends v. Grand Rapids R. Co., 172 Mich. 448, 138 N. W. Rep. 195.

The term "railroad company," as used in Section 3148, General Statutes of 1906, Chapter 4071, Acts of 1891, includes a street railroad company. See Consumers Electric Light & St. R. Co. v. Prior, 44 Fla. 354, 32 South. Rep. 797; Tampa Electric Co. v. Bourquardez, 72 Fla. 161, 72 South. Rep. 668. See also Shreveport Traction Co. v. Kansas City S. & G. Ry. Co., 119 La. 758, 44 South. Rep. 457.

Ordinarily street railroads are engaged in local and intrastate transportation and not in interstate commerce; and it was with much reason held in Omaha & C. B. St. R. Co. v. Interstate Commerce Commission, supra,

that the original interstate commerce act of 1887 made
by its terms applicable "to any common carrier or car-
riers engaged in the transportation of passengers or prop-
erty wholly by railroad," in foreign or interstate com-
merce, did not embrace street railroads "even though
they carry passengers across the State line." The inter-
state commerce act contemplated the regulation of trans-
portation by railroads that were regarded as the usual
"channels of interstate commerce."

In Board of Railroad Com'rs. v. Market St. Ry. Co.,
132 Cal. 677, 64 Pac. Rep. 1065, a *statutory* regulation for
examining the books and records of a common carrier
corporation, was declared to be not applicable to street
railroad companies under a constitutional provision giv-
ing railroad commissioners power to establish rates for
"railroad and other transportation companies." But in
that case the statute expressly excepted street railroads
from its operation, and the court in effect held that this
was not a violation of the Constitution.

In City of Barre v. Barre & M. Power & Traction Co.,
88 Vt. 304, 92 Atl. Rep. 237, it was held that particular
statutes conferring powers upon railroad commissioners
with reference to railroads did not apply to street rail-
roads, there being other provisions of law regulating
street railroads.

The case of Interurban Railway & Terminal Co. v. Pub-
lic Utilities Commission, 98 Ohio St. 287, 120 N. E. Rep.
831, P. U. R. 1919B, 212, 3 A. L. R. 696, was controlled
by the provisions of the State Constitution as to powers
of a municipality. See Notes, 3 A. L. R. 730, 736. In Co-
lumbus R. & P. Co. v. Columbus, 249 U. S. 399, the power
of the State to alter the contract rate was not asserted.

See also Miami Gas Co. v. Highleyman, 77 Fla. 523, 81 So. Rep. 775.

The intent of a valid statute is the law, and this is ascertained by a consideration of the language and purpose of the enactment. Where the legislative intent is clearly manifest by the language used, considered in its ordinary and grammatical sense, rules of construction are unnecessary and inapplicable. Where there is ambiguity or uncertainty of meaning in the words employed in a statute, the legislative intent should be ascertained by a consideration of the entire act and of others *in pari materia;* and in doing so appropriate effect should, if possible, be given to all the material portions of the law so as to carry out and effectuate in the fullest degree the intention of the lawmakers. See 25 R. C. L. 1004. Where a rule of construction is contained in the statute itself, that rule should be applied if it is necessary to use any rules of construction in determining the meaning of effect of the law. 25 R. C. L. 1049. The statute conferring upon the Railroad Commissioners authority to regulate the tariff rates of "all railroads, railroad companies and common carriers," must be interpreted by its own terms, and must be considered as a whole in determining whether it applies to street railroads.

When a valid statute confers a power or imposes a duty upon designated officials, a failure to exercise the power or to perform the duty does not affect the existence of the power or duty or curtail the right to require performance in a proper case. Chicago, Burlington & Quincy R. R. Co. v. Iowa, 94 U. S. 155, text 162.

Section 5 of Chapter 4549, Acts of 1897, enacted that "the provisions of this Chapter shall apply to the transportation of passengers and property, * and shall ap-

ply to *all railroad corporations and railroad companies* engaged in this State in the transportation of passengers or property by railroads therein from any point within this State to any point within this State  *  and the provisions of this Act shall apply to all persons, firms and companies, and to all associations of persons, whether incorporated or otherwise, that shall do business as common carriers upon any of the lines of railroads in this State (street railroads excepted) the same as to railroad corporations herein before mentioned."

Section 5 of Chapter 4700, Acts of 1899, entitled "An Act to revise and amend" Chapter 4549, Acts of 1897, etc., enacts that, "The provisions of this Chapter shall apply to the transportation of persons and property,  *  and shall apply to *all railroads, railroad companies and common carriers* engaged in this State in the transportation of passengers or property by the railroads, *or common carriers therein,* from any point within this State to any point within this State."

The portion of Section 5, Chapter 4549, which expressly excepted "street railroads" from "the provisions of the Act" was omitted from the amending and revising Act, Chap. 4700, Acts. 1899.  The quoted provision from Section 5, Chapter 4700, was re-enacted as Section 2890 of the General Statutes of 1906; and is embraced in the amending Act of 1913, Chapter 6527, Laws of Florida, and includes "common carriers" where they were not included in the Act of 1897.

The changes made in the statute shown by the italicized words, and the omission of the exception of "street railroads," contained in Chapter 4549, are material and significant, particularly in view of other substantial amendments and changes made by the Act of 1913.

Where an amendment is enacted, it must be assumed that a change in the existing law to the extent indicated by the nature of the amendment was intended unless a contrary intent appears from all of the enactments on the subject; and courts should give appropriate effect to the amendment. See 36 Cyc. 1165; 25 R. C. L. 1067.

Chapter 6527, Acts of 1913, amending stated Sections of the General Statutes of 1906, that constituted Chapter 4700, Acts of 1899, provides that "The provisions of this Chapter shall apply to the transportation of passengers and property * and shall apply to all railroads, railroad companies *and* common carriers engaged in this State in the transportation of passengers or property by railroads or common carriers therein from any point within this State to any point within this State; and defines the terms "railroad corporation" or "railroad company" to mean all corporations * now owning or operating * any railroad in whole or in part in this State." Chapter 4700, Acts of 1899, Section 2892, General Statutes of 1906, Compiled Laws of 1914, defines the term "common carrier" to mean "all companies * owning and operating railroads wholly or in part in this State." Chapter 6527, Acts of 1913, provides that "it shall be the duty of said commissioners to make reasonable and just rates of freight and passenger tariffs to be observed by all railroads, railroad companies and common carriers doing business in this State over their respective lines;" and that said Commissioners "shall have power to regulate all other matters pertaining to the receiving, handling, care, transportation and delivery of property, and to the safety, care, comfort, convenience, proper accommodation and transportation of passengers that shall be for the good of the public. The operation of this general grant or of any other general grant of power in this chapter shall not

be held to be limited by the grants of specific powers," and "to prescribe all rules and regulations appropriate for the execution of any of the powers conferred upon them by law either in express terms or by implication," and that "all doubts as to their jurisdiction and powers shall be resolved in their favor, it being intended that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest." Chapter 4700 omitted the exception of "street railroads" contained in Chapter 4549.

The changes made in the statute enlarge the jurisdiction and powers of the Railroad Commissioners, and it is expressly enacted that the laws shall "be construed liberally to further the legislative intent to regulate and control public carriers in the public interest."

The quoted and other provisions of the statute indicate an intent to extend the powers and duties of the Railroad Commissioners to the making of just and reasonable intrastate tariff rates for a|ll common carrier railroads that operate in this State, which comprehensive terms embrace street railroads; and an intent to exclude street railroads does not appear from a consideration of all the related enactments.

The statute expressly states that powers are conferred upon the railroad Commissioners "by law *either in express terms or by implication.*" It is specifically enacted that the provisions of the law "shall apply to *all* railroads, railroad companies *and* common carriers engaged in the transportation of passengers *or* property by railroads or common carriers therein from *any* point within this State to *any* point within this State." This is an enlargement

of the Act of 1897 from which street railroads were expressly excepted. The exception of street railroads was omitted from the Act of 1899, which superseded the Act of 1897.

A street railroad is a public carrier" to be "regulated and controlled in the public interest" and "for the good of the public;" and the statutes of the State provide no other authority for such regulation. A street railroad is a railroad; it is a common carrier; and it transports passengers from *points* to *points* within this State, though all the points may be in or near only one city, and though there be no stations or depots, or even no regular or designated or customary stops at which persons systematically enter or leave the cars. Transportation from *point* to *point* does not necessarily mean from an established station to an established station.

The alternative writ alleges, and the motion to quash admits, that the relator company "is a railroad company and common carrier of passengers," operating in the City of Jacksonville "and territory contiguous thereto;" and that under its franchise rights, the corporation is engaged in transporting passengers in cars over "a standard guage railroad track" from *points* to *points* within the city limits, "on the lines of its said railways."

As the statute expressly provides that powers are conferred upon the Railroad Commissioners "by law either in express terms or by implication," that the law shall be "construed liberally," and that "all doubts as to their jurisdiction and powers shall be resolved in favor" of the existence of the jurisdiction and power of the Railroad Commissioners, a "point" to "point" transportation by a railroad common carrier as used in the statutes may well mean a transportation between the stops of a street rail-

road car. If when "construed liberally" there be a doubt as to whether the comprehensive terms of the statute were intended to be applicable to street railroads, such doubt as to the "jurisdiction and powers" of the Railroad Commissioners, by the express requirement of the statute" shall be resolved in their favor." See Texas El. Co. v. Barton,      Tex. Civ. App.    , 213 S. W. Rep. 689.

The fact that some of the powers conferred by the statute are not applicable to street railroads is not controlling. All of the powers conferred may not be appropriate to the conditions of some railroads; but the powers are potentially applicable to all common carriers by railroad, and come into operation when    conditions warrant it. Some railroads may not cross others or have joint depots or connect with other railroads or with steamboat carriers, or operate dining or parlor or sleeping or refrigerator cars.

Some of the provisions of the statute are not appropriate to terminal companies, union depot companies, sleeping car companies, steamship companies, steamboat companies or express companies, to all of which companies the statute is expressly made applicable. The statute makes no distinction between steam and other railroads.

In enacting that the statute "shall apply to all railroads, railroad companies and common carriers," it was not necessary to speciffically mention street railroads, as they are ordinarily included in the terms "all railroads," "all railroad companies" and "all common carriers;" and the provision of the Act of 1897 excluding "street railroads" was omitted by the "amending and revising Act of 1899. Previous statutes relating to railroad companies had been judicially held to include street

railroads. It was appropriate to expressly mention steamboat companies, express companies and parlor, sleeping and dining car companies, as they do not own or operate railroads in this State. Street railroads do operate as railroad common carriers, and in this case the street railroad operates outside of as well as within the city limits.

In making Chapter 4549, Acts of 1897, applicable to "all railroad corporations and railroad companies," and to all corporations "that shall do business as common carriers upon any of the lines of railroads in this State (street railroads excepted)," the Legislature deemed the language used broad enough to include street railroads, and not intending that they should be included, expressly excepted them. Chapter 4700, Acts of 1899, enacted "to revise and amend" Chapter 4549, made the law applicable "to all railroad corporations, railroad companies *and* common carriers," and eliminated the exception of street railroads. If in using the words "upon any *of the lines of railroads* in this State," in the Act of 1897, it was necessary to except therefrom street railroads to keep them from being included in the terms used, then the broader and more comprehensive terms used in the revising and amending Act of 1899, with the express exception of "street railroads" omitted therefrom, show an intent to enlarge the subjects or objects to which the law is made applicable, so as to make "all railroad corporations, railroad companies and common carriers" include street railroads, as such terms ordinarily and grammatically do. This conclusion seems to be inevitable under Chapter 6527, Acts of 1913, amending the law in certain Sections "relative to the Railroad Commissioners, and the regulation of common carriers," which makes the law applicable to "all railroads, railroad companies *and*

common carriers," without excepting street railroads, and specifically requires the law to be "construed liberally," and further enacts that "all doubts as to the jurisdiction and powers of the Railroad Commissioners shall be resolved in their favor."

The word "jurisdiction" relates to the subjects or objects over which authority may be exercised, as well as to the nature and extent of the authority to be exercised over the subjects or objects.

Even if the city has special statutory authority to regulate the physical operation of street railroads within its territory, this would not affect the authority of the Railroad Commissioners as to tariff rates in the absence of statutory authority clearly conferred upon the city to regulate tariff rates to the exclusion of the State tribunal.

The opinions of counsel for the Railroad Commissioners and for a street railroad company, shown in the briefs of counsel for the respondents, indicate that in 1909 a doubt was entertained as to whether the authority of the Railroad Commissioners extended to street railroads, and that perhaps in view of the rule of construction then applied, the doubt was resolved against the existence of the authority. But since then Chapter 6527, Acts of 1913, enacts "that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally," and that "all doubts as to their jurisdiction and powers shall be resolved in their favor."

While the quoted provisions of Chapter 6527, as to a liberal construction of the Act, and as to resolving doubts as to jurisdiction and powers have no application when there is no statutory basis for an asserted power;

yet, as in this case, where there is a substantial and sufficient basis in a valid enactment, as shown by its terms or by a fair intendment of the terms used, upon which to predicate a regulatory power of the Railroad Commissioners, that does not conflict with fundamental law or with other express and controlling statutory provisions, the courts, pursuant to the statute, should liberally construe and give effect to the provisions, to make the intended jurisdiction and power effective so as "to further the legislative intent to regulate and control public carriers in the public interest." And doubts, if any, should "be resolved in favor' of the "jurisdiction and powers" of the Railroad Commissioners, as is expressly required by the statute. See State ex rel. Burr v. Jacksonville Terminal Co., 71 Fla. 295, text 334, 71 South. Rep. 474.

The authority of the Railroad Commissioners here discussed is more general and comprehensive than that considered in the case last above cited.

The alternative writ of mandamus issued herein alleges in substance, that the relator, E. J. Triay, by appointment of the United States Court, is the duly appointed receiver of the Jacksonville Traction Company, a railroad company and common carrier corporation under the laws of Massachusetts, and is operating a system of street railways consisting of over 64 miles of standard guage railroad track, in the city of Jacksonville, County of Duval, State of Florida, and territory contiguous thereto; that the line of railway is, and has been for years, operated as a common carrier of passengers; that three per cent. of the gross earnings of all the street railway lines in Jacksonville is paid to

the city in addition to other taxes; "that the Jacksonville Traction Company is operating its line of railway within the city of Jacksonville under and by virtue of the provisions of an ordinance, No. 1-67, passed by the city council of the city of Jacksonville on the 15th day of January, 1907, and approved on the 26th day thereof, and that, among other things, it is provided in Section five (5) of said ordinance that the fare to be charged by it for a continuous passage from any point within the city limits to any other point within the city limits, on the lines of its said railways, shall not exceed five cents, and that free transfer tickets shall be given to passengers paying a five-cent fare and accepted for carriage at intersecting points on the lines of the street railway or any other lines of street railway for the purpose of enabling them to make one continuous passage over the most direct route or routes;" that the total common and preferred stock of the company is $1,500,000.00; that its bonded indebtedness is $2,298,500.00; that the float indebtedness of the company is approximately $1,-095,000.00; that the physical value of the company's property, "outside of any element of good-will or franchise value, amounts in dollars and cents to far more than all of the indebtedness, stock and securities of the company;" "that the financial results of the operation of the lines of railway herein referred to during the year 1918 showed gross earnings of nine hundred and forty-five thousand dollars ($945,000), operating expenses of six hundred and thirty-eight thousand, three hundred and thirty-six dollars and nineteen cents ($638,336.19), taxes of seventy-one thousand, three hundred and thirty dollars and sixty-five cents ($71,330.65), interest charges of one hundred and seventy-five thousand, eight hundred and twenty-four dollars and ninety-five cents ($175,-

824.95), bond sinking fund of twenty-three thousand, two hundred and forty-one dollars and sixty-seven cents ($23,241.67), leaving a loss for the year, without taking into consideration any return to the owners of the property upon their money invested. As compared with the earnings for the year 1914, the gross earnings increased two hundred and thirty thousand, three hundred and thirteen dollars, and seventy-three cents ($230,313.73), or thirty-two per cent. (32%), while the net balance decreased fifty-seven thousand, seven hundred and twenty-two dollars and ninety-three cents ($57,722.93), or sixty-one per cent (61%); and such condition was brought about by an abnormal increase almost entirely in the cost of labor and matterials necessary in the operation of the company, said total increase of expenses being two hundred and twenty thousand, eight hundred and forty-five dollars and twenty-one cents ($220,845.21); that on September 27, 1918, it became necessary for the company to make a large increase in wages, and that if wages had been paid during the whole of the year of 1918 at such increased rate, the result of the years' operations would have shown a tremendous deficit; that the said wage scale is now in force and effect as a necessary item of expense in the operation of said railway, and will continue in effect; that the price of materials, instead of being reduced, is constantly being increased; and that the cost of operation of the railways operated by the traction company has largely increased instead of being decreased since the year 1918; that the rate of fare which the traction company is by said ordinance permitted to charge has not been increased, with the result that the operations of the company for the year 1919 show the gross receipts to be $1,024,527.03.

Operating Expenses ................................$835,875.14
Taxes ........................................................ 93,268.41
Interest Charges ................................... 174,965.80
Bond Sinking Fund ............................. 24,271.66 .

Thus making a loss for the year 1919 of one hundred and three thousand, eight hundred and fifty-three and 98/100 dollars ($103,853.98), without any provision for depreciation, upkeep, or obsolescence, or without any return whatever to the owners of the property for the money invested in the same; that the tracks and the construction thereof, and the power houses, poles, lines, rolling stock, machinery, and equipment of the Jacksonville Traction Company, are, and have been, of the best, and that no more modern machinery or equipment can be purchased or installed for the purpose of having a more economical operation of affairs; that the examinaiton by the relator of the operations of the company for the past two years is such as that he avers that the operations of the company have been carried on as economically as possible; and that he is satisfied, from his examination of the situation, and from the operations of the company since he has had charge of it as an officer of the United States Court, that it is utterly impossible to operate the same upon a five cents fare; that by authority and direction of the United States Court *
the relator did, on the 19th day of January, 1920, apply, in the City of Tallahassee, to the Honorable Railroad Commissioners of the State of Florida for the necessary relief; that the Railroad Commissioners upon a hearing on the petition filed with them, to-wit, on the 19th day of January, 1920, apply, in the City of Tallahassee, to the Honorable Railroad Commissioners of the State of Florida for the necessary relief; that the Railroad Commissioners upon a hearing on the petition filed with

them, to-wit, on the 19th day of January, 1920, held that they had no jurisdiction over the subject-matter contained in said petition, and for said reason denied the same."

These and other allegations of the alternative writ show a right of the relator to apply for such relief as the law affords in the premises. See Brooks S. Co. v. Railroad Commissioners, —— U. S. ——, 40 Sup. Ct. Rep. 183, Feb'y 2, 1920; Minneapolis, St. P. & S. S. M. R. Co. v. State of North Dakota *ex rel.* McCue, 236 U. S. 585, 35 Sup. Ct. Rep. 429; Norfolk & W. R. Co. v. Attorney General of State of West Virginia, 236 U. S. 605, 35 Sup. Ct. Rep. 437; Munn v. Illinois, 94 U. S. 113, text 126; Pensacola & A. R. Co. v. State, 25 Fla. 310, 5 South. Rep. 833; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, —— Sup. Ct. ——.

The State has the power to reduce or increase or otherwise regulate the transportation fares charged by the Jacksonville Traction Company; and such power is not affected by any authority conferred upon the City of Jacksonville or by the ordinance of the city limiting the fares to five cents. And the power of the State in the premises may properly be exerted through the Railroad Commissioners, an administrative tribunal of the State, under appropriate authority conferred by statute.

When "construed liberally" with "all doubts as to the jurisdiction and powers of the Railroad Commissioners resolved in their favor," as is expressly required by the act, the statute confers upon the Railroad Commissioners, a State tribunal, the authority and duty "to make reasonable and just rates of passenger tariffs to be observed by" the relator, which authority and duty, under Section 30, of Article XVI of the Constitution, if not independ-

ently of it, are not affected by the provisions of the city ordinance referred to in the alternative writ "that the fare to be charged from any point within the city limits to any other point within the city limits * shall not exceed five cents;" and the allegations admitted by the motion to quash show a right of the relator to have the respondents proceed in the exercise of the authority conferred and in the performance of the duty required by the statute. See City of Manitowoc v. Manitowoc & Northern Traction Co. 145 Wis. 13, 129 N. W. Rep. 925; V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523, 104 Atl. Rep. 667; State *ex rel.* Indianapolis Traction & Terminal Co. v. Lewis, —— Ind. ——, 120 N. E. Rep. 129.

The motion to quash the alternative writ is denied.

TAYLOR & WEST, J. J., concur.

BROWNE, C. J., AND ELLIS, J. concur specially.

BROWNE, C. J., concurring.

I concur fully in the opinion of Mr. Justice WHITFIELD except insofar as it might be construed as recognizing any right of the State under the doctrine of the police power to impair the obligation of the contract between the city and the Traction Company.

The ordinance under which the Traction Company is operating is a contract within the meaning of Section 17 of the Declaration of Right of the Florida Constitution. Trustees of Dartmouth College v. Woodward, 4 Wheat. 518.

The charter of the Dartmouth College, granted by King George III of Engalnd, that was held to be a contract, was 'for the purpose of establishing a school in New Hampshire for "the laudable and charitable design of spreading Christian knowledge among the savages * * * and also that the best means of education be established" and "for the education and instruction of the youth of the Indian tribes in this land, in reading, writing, and all parts of learning, which shall appear necessary and expedient for civilizing and christianizing children of pagans, as well as in all arts and sciences, and also of English youth and any others." This purpose was clearly within the recognized doctrine of the police power as affecting public morals and public safety, yet Mr. Chief Justice MARSHALL declared that the act of the New Hampshire Legislature in amending this charter in such minor details as the method of selecting Trustees was unconstitutional and void, as in conflict with the clause of the constitution of the United States which declares that no State shall make any law impairing the obligation of contracts.

There is no recognition in that opinion of any right in the State to impair the obligation of contracts when necessary to protect or preserve the public morals or public safety.

If there were nothing in our constitution controlling on this subject, we would have today, in the language of Mr. Chief Justice MARSHALL, in the Dartmouth College case, "On the judges of this court, then, is imposed the high and solemn duty of protecting, from even legislative violation, those contracts which the constitution of our country has placed beyond legislative

control; and, however irksome the task may be, this is a duty from which we dare not shrink."

Sec. 30, Art. XVI, Florida Constitution, provides "The Legislature is invested with full power to pass laws for the correction of abuses and to prevent unjust discriminations and excessive charges by persons and corporations, engaged as common carriers in transporting persons and property or performing other services of a public nature; and shall provide for enforcing such laws by adequate penalties or forfeitures."

This part of the organic law is of equal solemnity to any other portion, and is an exception to the limitation imposed by Sec. 17 of the Declaration of Rights. All conracts, therefore, coming within the purview of the purposes of Sec. 30, Art. XVI, are subject to this clause and limited by it.

This is the doctrine of the case of Tampa v. Tampa Water Works Company, 45 Fla. 600.

Without this clause of our constitution, I think the State would be precluded from changing the contract rates agreed upon by the city and the Traction Company, for I cannot accept the doctrine that the police power is a Super-constitution, before which the constitutional inhibition against the Legislature passing "any law impairing the obligation of contracts" must yield.

TAYLOR, J., concurring.

I concur fully in the opinion of Mr. Justice WHIT-FIELD in this case, as to the power of the Railroad Commissioners over the regulation of rates for that particular class of railroads popularly known as street railroads.

I am clearly of the opinion that they undoubtedly have jurisdiction over the fixing of rates for said particular class of roads.

By the provisions of Section 5 of Chapter 4549, approved May 8th, 1897, the Legislature that enacted that Chapter, after using broad language descriptive of the class of common carriers intended to be included in the act evidently thought that the terms used were broad enough to include street railroads and that an express exception of such roads was necessary to exclude them from its provisions, and in said Section 5 of that Act they did expressly except them.

The next session of the Legislature, that of the year 1899, enacted Chapter 4700, by which they revised and amended said Chapter 4549 passed at the next preceding session of 1897, and by Section 5 of said Chapter 4700, after using general terms and language still more broadly and comprehensively including street railroads within its provisions than did the previous Act, omitted the express exception of street railroads that was contained in the same section of the previous Act of which it was a revision and amendment.

This was tantamount to the Legislature saying in effect we have used terms and language entirely broad and comprehensive enough to include street railroads, and we did not wish to except them, but intend to include them, therefore, we have amended the previous Act by striking out and omitting the express exception of such roads contained in the previous Act.

ELLIS, J., concurring.

The Jacksonville Traction Company, a corporation under the laws of the State of Massachusetts, operates a

system of street railways in the city of Jacksonville and territory contiguous thereto. The corporation has an office in the city of Jacksonville and is a common carrier of passengers.

The property of the corporation consists of about sixty-four miles of standard gauge railroad track, power stations, cars, equipment and appurtenances. It also operates a line of railway about five miles in length as lessee, in the city of Jacksonville and in territory contiguous thereto. The physical properties of the company, so it is alleged, is worth an amount greatly in excess of its indebtedness, stock and securities.

The Traction Company has been operating its lines of railway within the city of Jacksonville under an ordinance which provides that it shall charge a fare of five cents for a continuous passage from any point within the city limits to any point within the city limits on the lines of its railways, and that free transfer tickets shall be given to passengers paying a five cents fare and accepted for carriage at intersecting points of the lines of the street railway or any other lines of street railway for the purpose of enabling them to make one continuous passage over the most direct route or routes.

The company has applied to this court for a writ of mandamus against the Railroad Commissioners of the State of Florida commanding them without delay to fix reasonable and just rates for the carriage of passengers on the company's railway lines. An alternative writ of mandamus was issued by this court upon the company's petition, which writ alleges that the company is unable to operate its lines except at a great loss to its stockholders upon the fare prescribed by the ordinance of

the city of Jacksonville, and that an ordinance of the
city providing for an increase in the fare for passenger
transportation was defeated by the electors of the city
at a special election held in October, 1919. That there-
after the General Electric Company filed a general
creditor's bill against the Jacksonville Traction Company
in the United States Court for the Southern District of
Florida, praying, among other things, for a receiver; that
a receiver was appointed and has qualified and taken
possession of the properties of the company and is operat-
ing the same and has obtained leave from the United
States Court to apply to the Railroad Commissioners for
the necessary relief; that the Railroad Commissioners
have declined to grant the relief sought upon the ground
that they have no jurisdiction or power to fix reasonable
and just rates for the transportation of passengers over
the lines of the company.

The Railroad Commissioners by their Special Counsel
and the City Attorney for the city of Jacksonville have
moved to quash the alternative writ of mandamus upon
the grounds, *viz*: That no jurisdiction over the subject-
matter set forth in the alternative writ of mandamus
has been either expressly or impliedly conferred upon
the Railroad Commissioners of the State of Florida; that
the writ fails to show a clear *prima facie* case in the
relator that entitled him to the relief prayed.

The alternative writ presents in behalf of the Receiver
of the Jacksonville Traction Company a most serious
situation. A street railway company operating its prop-
erties as a common carrier of passengers serves the peo-
ple in the city of Jacksonville and continguous territory.
It is a matter of common knowledge of which this court

may take notice, that the convenience of many thousands of people is served by the company. It is alleged that the company cannot earn enough money by operating its lines upon the fare prescribed by the city ordinance to pay its operating expenses, maintenance and interest upon its indebtedness; that for the year 1919 it operated at a loss of one hundred and three thousand, eight hundred and fifty-three dollars, without any provision for depreciation or upkeep, or any return to the owners for the money invested; that its credit is being impaired, it is unable to meet its obligations as they mature, or to provide necessary funds for maintenance; that it has been compelled to go into the hands of a receiver, yet the value of its properties is greater than all of its indebtedness, stock and securities.

This situation undoubtedly forecasts the ultimate abandonment of the service to many thousands of people, the dismemberment of the properties, the abandonment of the enterprise and great loss to investors.

Notwithstanding this situation the electors of the city of Jacksonville refused to ratify a city ordinance providing for relief to the company in an increase of passenger rates commensurate with the increase in the cost of operating the property. Under the provisions of the charter of the city of Jacksonville such an ordinance required the approval of the electors of the city to give it validity. In this predicament application was made by the Receiver of the company to the Railroad Commissioners for relief and they reply that they are without jurisdiction; that the power to grant the relief asked for has not been conferred upon them either expressly or impliedly.

That the Legislature has the power to prescribe just and reasonable rates for the transportation of passengers by street railways, whatever the motive power may be, is generally conceded. It is a police power inherent in the sovereignty of the State to be exercised in the public interest. See Munn v. Illinois, 94 U. S. 113; Wabash, St. L. & P. Ry. Co. v. People of Illinois, 118 U. S. 557, 7 Sup. Ct. Rep. 4; Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. Rep. 334, 348, 349, 388, 391, 1191; Chicago & G. T. Ry. Co. v. Wellman, 143 U. S. 339, 12 Sup. Ct. Rep. 400; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. Rep. 418; Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S. 265, 29 Sup. Ct. Rep. 50; State ex rel, Kenosha Gas & Electric Co. v. Kenosha Electric R. Co., 145 Wis. 337, text 346, 129 N. W. Rep. 600; Milwaukee Electric Ry. & Light Co. v. Railroad Commission of Wisconsin, 238 U. S. 174, 59 L. Ed. 1254, 35 Sup. Ct. Rep. 820; Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, —— Sup. Ct. Rep. ——.

This power in nowise depends upon Section 30 of Article 16, of the Constitution, which invests the Legislature with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property or performing other services of a public nature. The power is inherent in the State to be exercised by the legislative authority to establish regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community. The power can neither be abdicated nor bargained away, and is inalienable even by express grant, and all contracts and property rights are held subject to its fair exercise.

See Atlantic Coast Line R. Co. v. City of Goldsboro, North Carolina, 232. U. S. 548, 34 Sup. Ct. Rep. 364.

In the making or establishing of just and reasonable rates of charge or tolls to be charged by one engaged in a public service the State exercises its police power in the interest of the community. The general good of the public may not always consist in a reduction of tolls or rates charged for a public service. The convenience, necessity and comfort of the community must be considered when the State is about the business of establishing reasonable rates for such a service. It would most assuredly not be in the public interest and for the common welfare to permit an industry which supplies to a large number of people water, lights, electricity, transportation or other commodities or service in which the public is interested, to become inoperative for lack of sufficient compensation to pay operating expenses, because the Legislature refuses to exercise the power to establish a reasonable rate of charge for the service.

It is not a question of the guardianship of public service corporations, but a question of convenience, health, safety and general good of the community. The Legislature is not inhibited by any provision in the constitution from establishing just and reasonable rates of charge or tolls for a public service, and this power may be delegated to a Railroad Commission, which is a mere legislative method of making such rates to meet at all times, whether the Legislature is in session or not, the exigencies as they arise, to the end that the convenience, safety and general welfare of the State may be promoted or secured. And this power to make just and reasonable rates implies the power to prevent overcharges, abuses and discriminations by any persons or corporations engaged

23—Vol. 79

in a business affected with a public interest. The Constitution of 1885 expressly provides in Article 16, Section 30, that the Legislature is invested with full power to enact laws for the *correction* of *abuses* and to *prevent unjust discrimination* and *excessive charges* by persons and corporations engaged as common carriers, but the idea is-not excluded that the Legislature may also enact laws to secure just and reasonable charges for transportation of freight and passengers by common carriers to the end that the industries may be enabled to earn a fair compensation for the service rendered and the people secured in their enjoyment of those utilities, conveniences and necessaries and the progress of the State promoted and welfare of the community conserved.

In the case of Portland Ry., Light & Power Co. v. Railroad Commission of Oregon, 229 U. S. 397, 57 L. Ed. 1248, 33 Sup. Ct. Rep. 820, Mr. Justice DAY, speaking for the court, said: "The authority of the States to control by appropriate legislation the rates of fare to be charged by street railway companies and other common carriers wholly within their borders and subject to their laws, is unquestionable." It is immaterial whether the power to make reasonable and just rates of fare to be charged by common carriers, grows out of the power to prevent unlawful discriminations or unjust charges, or whether the latter power is incident to the former. The State has the inherent power by appropriate legislation to control the rates to be charged by common carriers for transportation of freight or passengers over public highways, because of the duty and power of the State to enact such laws as are necessary for the promotion of the peace, health, safety, comfort and general welfare of the community. See Milwaukee Electric Ry. & Light Co. v. Railroad Commission of Wisconsin,

*supra;* Union Dry Goods Co. v. Georgia Public Service Corporation, *supra;* Chicago, B. & Q. R. Co. v. State of Nebraska *ex rel.* City of Omaha, 170 U. S. 57, 18 Sup. Ct. Rep. 513; Munn v. Illinois, *supra.*

The State may authorize its municipal corporations to establish by contract the rates to be charged by a public service corporation, but if such power is claimed by the municipality to the exclusion of the State's power to prescribe reasonable rates during the term of the contract, the existence of the power and the authority to make such a contract must clearly and unmistakably appear, and all doubts must be resolved in favor of the State's superior power to prescribe reasonable rates. See State *ex rel.* Webster v. Superior Court for King County, 67 Wash. 37, 120 Pac. Rep. 861, L. R. A. 1915C 287, and authorities therein cited; Salt Lake City v. Utah Light & Traction Co., —— Utah ——, P. U. R. 1918 F 377, 173 Pac. Rep. 556, 3 A. L. R. 715; Freeport Water Co. v. City of Freeport, 180 U. S. 587, 21 Sup. Ct. Rep. 493.

Chapter 3775 Acts of 1887, establishing the municipality of Jacksonville and providing for its government and prescribing its jurisdiction and powers, vested in the mayor and city council the power to "grant the right of way through the streets, avenues and squares of said city for the purpose of street or other railroads." It is alleged in the alternative writ that the Jacksonville Traction Company is operating its lines of railway within the city of Jacksonville under an ordinance passed by the city council in January, 1907, prescribing a rate for transportation of passengers of an amount not to exceed five cents for one passage. There is no provision in the charter of the city of Jacksonville which grants to the city the power to make rates for the transporta-

tion of passengers over its street or other railroads, to the exclusion of the States' power to prescribe rates. Nor if the State's power in this regard could be abdicated or transferred to the municipality is there any language in the charter which could be so construed?

In granting a franchise to the Traction Company, therefore, the city merely exercised a power to contract with the company in a matter in which the city acted in its corporate rather than in a governmental character. See Keggin v. Hillsborough County, 71 Fla. 356, 71 South. Rep. 372. This being true no contract exists between the city and the Traction Company, the obligation of which could be considered to be impaired, if the State in the exercise of its police power by appropriate measures disregarded the rate fixed by the city ordinance and established another which should be deemed to be reasonable. Because where rights are subject to State regulation they cannot be removed from the power of the State by making a contract about them. "The contract will carry with it the infirmity of the subject matter." See Hudson County Water Co. v. McCarter, 209 U. S. 349, 28 Sup. Ct. Rep. 529; City of Dawson v. Dawson Tel. Co., 137 Ga. 62, 72 S. E. Rep. 508; City of Manitowoc v. Manitowoc & Northern Traction Co., 145 Wis. 13, 129 N. W. Rep. 925; Turtle Creek Borough v. Pennsylvania Water Co., 243 Pa. 415, 90 Atl. Rep. 199; Bellevue Vorough v. Ohio Valley Water Co., 245 Pa. 114, 91 Atl. Rep. 236.

Under the constitution of 1885 municipalities are the creatures of and subordinate to the will of the Legislature, which provides for their government and prescribes their jurisdiction and powers, and may alter or amend the same at any time. Art. 8 Sec. 8, Const. 1885.

In whatever manner, therefore, the city of Jacksonville imposed upon  the Traction Company  the rate to be charged for the transportation of passengers, its action was subordinate to the will of the Legislature and subject to its superior power.   And when the State asserts its jurisdiction over the subject-matter and there is no room for concurrence, the municipal charter or ordinance must give way.   Dillon's Munic. Corp. (5th ed.) 631.

Chapter 4052, Acts of 1891, providing for the forfeiture of grants, rights, privileges, licenses and immunities in certain cases contains no language indicating a purpose upon the part of the Legislature to set in operation a power or agency over which it has no control and to which it surrendered or abdicated the sovereignty of the State.

I agree with counsel for the city of Jacksonville and with the counsel for the Railroad Commissioners, therefore, that the decision of this case depends upon the extent of the jurisdiction conferred upon the Railroad Commissioners.   Whether the power conferred is broad enough to include street railroads in the public utilities over which the Commissioners are vested with control.  In construing the Railroad Commission Act, Chapter 4700, Acts of 1899, the task is not made difficult by the possibility that the city of Jacksonville had power under any act of the Legislature to abrogate by ordinance or contract the sovereign power of the State to regulate the rates of the Traction Company.   In enacting the law the Legislature was not embarrassed by any consideration that such power had been vested or attempted to be vested in any agency of the State or municipality therein.  It was free and untrammelled to write into the law full and complete power to the Commissioners over the common carriers doing intrastate business in this State.   The pur-

pose of the law was not only to enable the State to prevent abuses and unjust discriminations and overcharges by common carriers in rendering the public service which they had undertaken to perform, but to create an agency through which the State might at all times act, when the occasion should arise, in the matter of establishing just and reasonable rates for the transportation of passenger or freight by common carriers wholly within this State. The act should be construed in the light of this purpose, and not by consideration of any evils practiced by one or more of the common carriers at the time the law was enacted. The power to prescribe reasonable rates for the transportation of passengers and freight by common carriers existed in the State from the moment of its organization. Section 30 of Article 16 of the Constitution is not a limitation upon the Legislature. Common carriers are not and should not be regarded as enemies of the commonwealth, but rather as aids to its growth, development, progress and great conveniences to the comfort, convenience and welfare of the people. They are industries to be encouraged and not discouraged, rather to be aided than imposed upon; but should be controlled and regulated by the State, not only that their officers and owners may not abuse their great powers and harrass and annoy the people with discriminations, abuses and unjust charges, but also to the end that they may prosper and fulfill their mission as necessary agencies in the progress of the State by earning fair, just and reasonable compensation for the service rendered. In the light of these considerations it appears to me the act should be construed.

The word railroad in its broadest signification includes a street railroad. There is no definite rule of construc-

tion as to whether an act of the Legislature dealing with "railroads" or "railways" includes street railroads. The meaning of the word depends upon the context and general purpose or intent of the lawmaking power. See Bloxham v. Consumers' Electric Light & St. R. Co., 36 Fla. 519, 18 South. Rep. 444. Section 3148, General Statutes, 1906, Florida Compiled Laws, 1914, prescribing the liability of a railroad company for damage done to stock or other property by the running of locomotives or cars, etc., includes a street railroad company. See Consumers' Electric Light & St. R. Co. v. Pryor, 44 Fla. 354, 32 South. Rep. 797; Tampa Electric Co. v. Bourquardez, 72 Fla. 161, 72 South. Rep. 668.

Chapter 4549, Acts of 1897, providing for the regulation of the Railroad Schedules, and which was amended by Chapter 4700, Acts of 1899, expressly excepted street railroads from the provisions of the Chapter which, in Section five, defined the terms "Railroad Coporation" or "Railroad Company" to mean all corporations or individuals then owning or that may hereafter own or operate any railroad in whole or in part in the State and to all persons, firms and companies who shall do business as common carriers upon any of the lines of railroads in this State, "street railroads excepted." Chapter 4700, Acts of 1899, in defining the same terms uses broader language in that the terms are made to include not only those who do business as common carriers upon any of the lines of railroads in the State, but those who own or operate *any train or car* service on *any railroad* in the State, and eliminates the words "street railroads excepted."

The former Act in Section 5 provided that the provisions of the Chapter should apply to "all railroad cor-

porations and railroad companies engaged in this State," etc. The latter act in the same section provided that the provisions of the act shall apply to "all railroad corporations, railroad companies *and* common carriers engaged in this State in the transportation of passengers *or* property by the railroads or common carriers therein." These changes in the language of the Act of 1897 are material and significant, particularly in view of the provisions of Chapter 6527, Acts of 1913, amending Sections of the General Statutes of 1906 that constituted Chapter 4700 Acts of 1899 which, preserving the language as to the application of the provisions of the act to "Common Carriers," provided that all doubts as to the jurisdiction and powers of the Railroad Commissioners shall be resolved in their favor, "it being intended that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed *liberally* to further the legislative *intent* to regulate and control *public carriers* in the *public interest.*" The Traction Company is unquestionably a common carrier of passengers on a railroad line or lines and undoubtedly is included in the term "Common Carrier" as used in the Act. The doubt, if any there is, arises from the assertion that the purpose of the Acts of 1897, 1899 and 1913 was merely to correct abuses and overcharges that had been practiced by steam or so-called "commercial railroads." But the Act of 1913 states that the purpose was to "regulate and control public carriers in the public interest." Here the language of the Acts of 1899 and 1913 is broad enough to include street railroads, if there is any doubt that the Legislature so intended it, should be resolved in favor of the jurisdiction of the Railroad Commissioners to the end that the public interests might be served. See State

*ex rel.* Burr v. Jacksonville Terminal Co., 71 Fla. 295, text 334, 71 South. Rep. 474.

I am, therefore, of the opinion that the motion to quash the alternative writ should be denied.